NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| DAISY PABON,<br><br>        *Plaintiff*,<br>v.<br><br>SCOTT INFANTE, THE NEW JERSEY DEPARTMENT OF CORRECTIONS, JOHN AND JANE DOES 1 THROUGH 5,<br><br>        *Defendants*. | Civil Action No.: 14-cv-2387 (PGS)(LHG)<br><br>**MEMORANDUM**<br>**AND**<br>**ORDER** |

**SHERIDAN, District Judge.**

Daisy Pabon ("Plaintiff" or "Pabon"), formerly a Senior Corrections Officer ("SCO") employed by the New Jersey Department of Corrections ("DOC"), filed her Complaint in this Court on April 14, 2014, alleging violations of 42 U.S.C. § 2000e, Title VII. The Complaint was filed against the DOC and Correction Lieutenant Scott Infante ("Infante") (collectively, "Defendants"), and it brings claims for hostile work environment and retaliation.

**Facts and Procedural History**

Pabon was employed by the DOC from 2001 until 2013. She started as a corrections officer, and after 16 months became a SCO. She worked as a SCO at Edna Mahan Correctional Facility ("EMCF"), a female-only prison. In or about May 2011, Infante was assigned to EMCF as a shift commander for the third shift, and Plaintiff claims that from May 2011 until January 9, 2012, Infante engaged in "conduct harassing in nature for the purpose of entering into a personal and sexual relationship" with Plaintiff. (Defendants' Statement of Material Facts, (DSMF), ECF No. 22-3, ¶¶ 2-7). Plaintiff worked as an Armed Patrol Officer on the third shift from about 2006

1

until the end of her employment, and was responsible for patrolling the perimeter inside an armed vehicle. Her regular work hours were from 10:00 p.m. to 6:00 a.m. There were three other Armed Patrol officers assigned to that shift. Infante, as shift commander, worked mainly in the Command Center. SCO's report directly to Sergeants, and Sergeants report directly to Lieutenants, so Infante, a Lieutenant, was two levels above Pabon. (DSMF ¶¶ 12-19).

Within three weeks of Pabon arriving at ECMF, Infante allegedly said to her that, "I hope that your boyfriend appreciates you." Plaintiff testified that this statement came "out of nowhere." (PSMF ¶ 93). Pabon says that she responded that she was "faithful to the man she was with," said that the comment was inappropriate, and asked how he knew so much. Infante allegedly said something to the effect of, "[t]his is just a technique I use when I want to know what I want to know," and walked away laughing. (PSMF ¶ 94).

Plaintiff testified that after this, Infante would call her to the Command Center and he would get in the patrol vehicle with her. He would say he was "single" and "lived alone." (PSMF ¶ 95). One time in the patrol car, he allegedly asked Plaintiff why she was not at another officer's birthday, and said he wanted to see what she looked like out of uniform. He also purportedly asked her out to breakfast and dinner. She declined all offers. (PSMF ¶ 96).

When they were in the patrol car, Plaintiff claims that Infante would suggest that they stop in dark and secluded places. (PSMF ¶ 118; Ex. B at 149:2-150:22). This allegedly happened almost daily. (PSMF ¶ 106; Ex. B at 119:15 -122:2). Plaintiff testified that one time in the patrol vehicle, Infante moved close to Plaintiff as if he was going to kiss her, and Plaintiff moved to avoid him. He allegedly laughed every time he did this. (PSMF ¶ 122).

Plaintiff testified that Infante invited her to go on vacations with him. (PSMF ¶ 97). He also allegedly asked her out for breakfast and coffee "numerous times" while riding in the

vehicle (PSMF ¶ 98). Plaintiff testified that a female co-worker asked Plaintiff in front of Infante if she wanted to get breakfast with her. Infante rolled his eyes, and through body language, indicated that she should not go. After, in the patrol vehicle, Infante allegedly got in and told Plaintiff that, "I better not know or hear that you went out to breakfast with Kim and not with me." Plaintiff testified that Infante said he was serious and not joking. (PSMF ¶ 102).

Infante allegedly told Plaintiff on one occasion that he knew where she lived and that he had grown up there. Plaintiff claims that Infante said that he was in the neighborhood and wished that he had seen her. According to Plaintiff, she never told him where she lived. (PSMF ¶ 104).

Infante also repeatedly brought or sent Plaintiff coffee, according to Plaintiff. Another officer who witnessed this said, "[t]he lieutenant has the hots for you." (PSMF ¶ 108).

Infante allegedly told Pabon that he arranged his overtime so that he could be at work when Plaintiff was there. (PSMF ¶ 113; 123:12-125:14)

According to Plaintiff, Infante had told her that other women had made complaints of sexual harassment against him and he had, "defeated them all." (PSMF ¶ 119).

In October 2011 Plaintiff told Infante that she did not want him to ride with her unless it was only for business. She said that other people had been making comments about it. (PSMF ¶ 114). She was worried that other co-workers would think she was having a romantic relationship with Infante, and would feel ostracized (PSMF ¶ 116).

One occasion, Infante allegedly called Plaintiff numerous times throughout the night. Infante said that he wanted to take her out for her birthday, and that he had a gift card for her; but she continually declined. Plaintiff had never told Infante that it was her birthday. Plaintiff testified that Infante then said, "[n]ow that I know you won't ever go out with me and take this," that he was going throw it in the trash; and in an outrage, he allegedly told Plaintiff, "[g]ood

luck. You have truly made the best decision for your life," and slammed the phone. Plaintiff took this as a threat. (PSMF ¶ 100).

Infante invited himself to go on Pabon's vacation to Puerto Rico, according to Plaintiff. (PSMF ¶ 120). This vacation occurred shortly after she asked Defendant not to ride with her anymore. When she returned from her several week trip, Plaintiff believed that Infante began treating her with more hostility, and says that he started yelling at her in front of others and would look at her demeaningly. Pabon thought she always had to "watch [her] back." (PSMF ¶ 121).

In Pabon's affidavit in opposition to the motion for summary judgment, Pabon says that on January 9, 2012, Infante called her to the Command Center, and began yelling at her, making allegations about her whereabouts, even though she was with another sergeant. Plaintiff claims that Infante saw this as retaliation for refusing his advances. (PSMF ¶ 125).

That day, Pabon made a verbal complaint about Infante to Assistant Superintendent Helen Adams (DSMF ¶ 43). Adams then reported those allegations to then DOC Equal Employment Division ("EED") Director Victoria Kuhn. (DSMF ¶ 45). The complaint was assigned to an EED investigator on or about January 19, 2012. (DSMF ¶ 46). Infante was temporarily reassigned from EMCF to another institution, East Jersey State Prison, pending the outcome of the EED investigation. (DSMF ¶ 47). Plaintiff filed a written EED complaint on or about February 2, 2012, which was investigated by EED Investigator Robert Roemer. (DSMF ¶¶ 48-49). A total of 21 witnesses were interviewed, and log books, statements and documentation was reviewed. (DSMF ¶¶ 56-57). On or about July 16, 2012, Plaintiff was issued a determination letter from the EED, which said that the EED investigation did not find a violation of the Public Policy Prohibiting Discrimination in the Workplace. (DSMF ¶¶ 58-59). The DOC opted to take

remedial action anyway, and directed Infante to attend professional and related trainings, including a one-on-one EED training. Infante was then permitted to return to his regular assignment at EMCF. (DSMF ¶¶ 60-62).

According to a report from Investigators Kristina Gonzales and Robert L. Roemer, dated May 30, 2012, Infante had been the subject of four prior EED investigations. (PSMF ¶ 126; Ex. O to Gellene Cert.). Defendant denies this, but it is not clear on what grounds. (Defendants' Reply to Plaintiff's Counter-Statement of Material Facts (DRSMF), ¶ 126).

Infante provided a different set of facts to the EED investigators. He said that sometimes Plaintiff would stop the vehicle and ask him for a ride. He said that he never spent time in the vehicle with her. (PSMF ¶ 127). However, other officers substantiated Pabon's account. SCO Clasen told investigators that Infante would waive Plaintiff down for a ride, and that he would spend an unusual amount of time in the vehicle with Plaintiff. (PSMF ¶ 128). SCO Rios told investigators that he saw Infante in Plaintiff's vehicle on many occasions, and it was clear Infante did not want to be seen. (PSMF ¶ 129). SCO Morales made a similar accusation. (PSMF ¶ 130). Also, Infante told investigators that he never asked Plaintiff out for breakfast. (PSMF ¶ 131). But SCO Forbeck said that he heard Infante ask Plaintiff out for breakfast. (PSMF ¶ 132). Infante also said that he never brought Plaintiff coffee; he would occasionally buy boxes of coffee but not specifically for her. Correction Sergeant Davis stated that he saw Infante give her a Chi-latte tea. (PSMF ¶ 134).

After Infante returned in late July 2012, two disciplinary charges were filed against Pabon. In the first one, on August 5, 2012, it was alleged that Pabon failed to perform a proper vehicle inspection, including oil check (DSMF ¶ 67; PSMF ¶ 140). The second disciplinary notice was issued on or about October 12, 2012 for an incident that occurred on September 1,

2012. (DSMF ¶ 70). Defendant claims that Lieutenant Morton directed Plaintiff to put oil in the vehicle, but she "suddenly became agitated" and requested to go to the hospital. (DSMF ¶ 74). For this, Plaintiff received a second disciplinary charge for insubordination and conduct unbecoming an employee. (DSMF ¶ 71).

According to Pabon's account of this incident, she told Lieutenant Morton that she did not know how to put oil in the vehicle, and was told not to put oil in it. But later, Lt. Morton shouted at her, denying that he told her that. Infante was the shift commander and this occurred in his view. Morton kept going in and out of the command center as if he were consulting with Infante. This was the third vehicle Pabon was given that night, and all had been defective. She thought she was being set up. Pabon had never had a disciplinary charge filed against her in all her time as a corrections officer. She claims that the increasing pressure caused her to break down and have to go to the hospital. (PSMF ¶ 141). She says that she was convinced that the DOC would never do anything to help her, and she did not return to work after this. (PSMF ¶ 142). Plaintiff never returned to work after the September 1, 2012 incident. (DSMF ¶ 79).

**Legal Standard:**

Summary judgment is appropriate under FED. R. CIV. P. 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be

6

believed and all justifiable inferences are to be drawn in his favor." *Marino v. Indus. Crating Co.,* 358 F.3d 241, 247 (3d Cir. 2004) (*quoting Anderson,* 477 U.S. at 255).

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. *See Jersey Cent. Power & Light Co. v. Lacey Twp.,* 772 F.2d 1103, 1109 (3d Cir. 1985). The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial. *See Anderson,* 477 U.S. at 248; *Siegel Transfer, Inc. v. Carrier Express, Inc.,* 54 F.3d 1125, 1130-31 (3d Cir. 1995). Moreover, only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgment. *See Anderson,* 477 U.S. at 247-48.

**Analysis**:

**I.   Title VII and individual employees**

The Third Circuit has held that the term "employer" in Title VII does not include individual employees. *See Sheridan v. E.I. DuPont de Nemours & Co.,* 100 F.3d 1061, 1078 (3d Cir. 1996). Plaintiff does not challenge this point in her opposition brief. Therefore, all claims against Defendant Infante are dismissed with prejudice.

**II. Hostile work environment**

Plaintiff makes a claim for hostile work environment in violation of Title VII against Defendant DOC. To make out such a claim, Plaintiff must establish five elements:

> 1) the employee suffered intentional discrimination because of [her] sex, 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of *respondeat superior* liability.

*Mandel v. M&Q Packaging Corp.,* 706 F.3d 157, 167 (3d Cir. 2013).

Whether the discrimination was severe or pervasive requires a plaintiff to provide evidence that her "workplace [was] permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Amtrak v. Morgan*, 536 U.S. 101, 116 (2002). "In determining whether an environment is hostile or abusive, [the court] must look at numerous factors, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; whether it unreasonably interferes with an employee's work performance." *Weston v. Pennsylvania*, 251 F.3d 420, 426 (3d Cir. 2001). When analyzing the severity, the court should "consider the totality of the circumstances." *Caver v. City of Trenton*, 420 F.3d 243, 262-63 (3d Cir. 2005) (internal quotations omitted). " '[O]ffhanded comments and isolated incidents (unless extremely serious)' are not sufficient to sustain a hostile work environment claim...Rather, the 'conduct must be so extreme to amount to a change in the terms and conditions of employment.' " *Caver*, 420 F.3d at 262. "[T]he ordinary tribulations of the workplace, such as sporadic use of abusive language, gender-related jokes, and occasional teasing" do not meet this threshold. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotations omitted). Whether the work environment is sufficiently hostile should be viewed subjectively and objectively. It should be viewed objectively from the viewpoint of a "reasonable person" to protect against the "hypersensitive employee." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1483 (3d Cir. 1990) (internal quotations omitted).

Defendants argue that many of the allegations are common occurrences amongst co-workers, including asking to ride around with her on patrol, bringing her coffee, and engaging in small talk over the prison phone while on duty.

Defendants cites to *Funayama v. Nichia Am. Corp.*, 482 F. App'x. 723 (3d Cir. 2012), where the Third Circuit held that there was no Title VII violation where a female employee claimed that the company president had sporadically over a nine year period made sexual advances outside of the office, gave her a sexually explicit book, suggested they share a hotel room on a business trip, made a comment about her body, sometimes touched her side and back, and on many occasions asked to come to her apartment for a drink. *Id.* at 725. However, the incidents in *Funayama* occurred several years apart: 1999, 2001, 2003, 2007, and 2008. In this case, the alleged harassment was ongoing, and Plaintiff testified that the encounters made her uncomfortable, unlike in *Fuanayama*, where the plaintiff said that she did not find many of the incidents offensive at the time, and did not say that they had an effect on her. *Id.*

Defendant points to several other cases where courts did not find a severe or pervasive hostile work environment. *See Sala v. Hawk*, 481 Fed. Appx. 729, 735 (3d Cir. 2012) (finding no hostile work environment where a DEA officer alleged that her supervisor sent her an inappropriate video, and spoke about her appearance "in tight jeans with a gun and a badge"); *see also Grassmyer v. Shred-It USA, Inc.*, 392 Fed. Appx. 18, 25 (3d Cir. 2010) (finding no hostile work environment where a male colleague spoke about the size of his genitalia and his sexual exploits, joked about a friend going to "titty bars," often saying "fuck" in the office, and playing a CD on his office computer with sexual explicit language). Defendants also cite to New Jersey Law Against Discrimination ("LAD") cases that have held that a hostile work environment is not evidenced by a co-worker making unwanted advances. *See Godfrey v. Princeton Theological Seminary*, 196 N.J. 178, 197-198; 189-190 (2008) (seminary students claimed that an older seminary resident often sat near them in the cafeteria or at events, sent them greeting cards and gifts, asked one on dates, and said they should get together on vacation);

see also *Anastasia v. Wakefield*, 455 Fed. Appx 236, 237 (2010) (one of plaintiff's supervisors invited her to lunch, sought to pursue a relationship with her in a number of emails over a two week period after she said she was not interested).

However, the Court believes that there are sufficient facts here for a reasonable jury to find that the discrimination was severe or pervasive, and it would affect a reasonable person in Plaintiff's position. Plaintiff testified that: Infante asked her about her boyfriend on a number of occasions and said that he would be a better boyfriend; he invited himself on her vacation, and offered that she join him on his vacation; he said that he wanted to see how she looked outside of uniform and he bought her gifts; he allegedly threatened her; he insisted on riding with Pabon almost every night in the patrol vehicle, where they would park in isolated, dark parts of the facility; and he allegedly warned her that any charges against him would not succeed, and purportedly retaliated against her by berating her in front of other officers under pretext. Taken together, the alleged harassment seems to have permeated Plaintiff's working environment. Moreover, the harassment came from one of her supervisors, Infante, compounding the effect. In particular, a reasonable jury could find that the incidents where Plaintiff and Infante parked in isolated, dark spots of the facility, when he would urge her to date him and attempt to kiss her created a hostile work environment.

Under the fifth prong, Plaintiff must show *respondeat superior* liability on the part of DOC. An "employer is not 'automatically' liable for harassment by a supervisor." *Faragher*, 524 U.S. at 777. Even where the alleged harasser is a supervisor and plaintiff has demonstrated an objectively hostile work environment, the employer may have an affirmative defense that includes "two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly a sexually harassing behavior, and (b) that the plaintiff employee unreasonably

failed to take advantage of any preventive or corrective opportunities by the employer or to avoid harm otherwise." *Id.* at 807. "An employer's remedial action is adequate 'if it is reasonably calculated to prevent further harassment.' Accordingly, the employer cannot be liable under Title VII if its remedial action stopped the harassment." *Huston v. P&G Paper Prodcs. Corp.*, 568 F.3d 100, 110 (3d Cir. 2009).

This defense does not apply if the employer took a "tangible employment action" against the plaintiff. *Faragher*, 524 U.S. at 807. A "tangible employment action" is an official action "such as discharge, demotion, or undesirable reassignment." *Pennsylvania State Police v. Suders*, 542 U.S. 129, 137 (2004). The affirmative defense also does not apply if the plaintiff "quits in reasonable response to an employer-sanctioned adverse action officially changing her employment status or situation, for example, a humiliating demotion, extreme cut in pay, or transfer to a position in which she would face unbearable working conditions." *Suders*, 542 U.S. at 134-35.

Defendants explain that there are no allegations that Plaintiff was subject to such a tangible employment action or resigned in response to an adverse action. Therefore, Defendants claim they may raise the affirmative defense. Plaintiff admits that she received a copy of the DOC's policy prohibiting workplace discrimination. (DSMF ¶ 33). She did not make a verbal complaint until January 9, 2012, even though she claims that harassment began in early July 2011. (DSMF ¶¶ 34, 22). As such, she did not "take advantage of preventive or corrective opportunities" provided by DOC, according to Defendants. She did not file a written complaint with the DOC's EED until February 2, 2012. (DSMF ¶ 48). The DOC immediately began an investigation, and transferred Infante to a different prison. (DSMF ¶ 47). Following an investigation where plaintiff was interviewed twice and 21 witnesses were interviewed, her claim

11

was denied, but Infante still had to attend professional and one-on-one EED training. (DSMF ¶¶ 56, 59, 60-61). The alleged harassment ended on January 9, 2012, when she reported it. (DSMF ¶ 20). She only complains about disciplinary notices from different Lieutenants. (DSMF ¶¶ 69-72).

Plaintiff argues that, although there was an investigation, it was ineffective because Infante clearly lied. Three witnesses said they saw Infante inside the patrol vehicle with Pabon on a number of occasions for extended periods of time. Infante denied this. (PSMF ¶¶ 129-30). He also allegedly lied about bringing her coffee, asking her out for breakfast, and about giving Officer Adams a gift. (PSMF ¶ 134). This was also purportedly the fifth sexual harassment investigation of Infante. (PSMF ¶ 126). Plaintiff cites to *Knabe v. Boury Corp.* 114 F.3d 407, 412-413 (3d Cir. 1997), where the Court recognized that an inadequate investigation could be a sufficient challenge. "The question before us is not whether the investigation was adequate – it appears not to have been – but rather whether the remedial action was adequate…Rather…we must consider whether the action was 'reasonably calculated to prevent further harassment.' " *Id.* In *Knabe*, the remedial action was adequate because it stopped the acts of sexual harassment. Plaintiff claims that the case here is different because she was later disciplined even though she had never been disciplined in all her years as a corrections officer. (PSMF ¶ 141).

The Court believes that a jury could reasonably find that the remedy was inadequate. There is a dispute as to whether this was the fifth complaint against Infante. This is a material issue in dispute, as it could be determined that Infante should never have been restored to his job, let alone the same job where he worked as supervisor to Pabon. Whether this was indeed Infante's fifth complaint, and whether introduction of this evidence should even be permissible at trial, are questions for a future in limine motion.

The *Faragher-Ellerth* defense involves a determination of "reasonableness" and "[r]easonableness is a paradigm question of fact." *Ciegg v. Falcon Plastics, Inc.*, 174 Fed. App'x. 18, 26 (3d Cir. 2006); see also *Minarsky v. Susquehanna County*, 2016 WL 183280, at *5 (M.D. Pa. 2016) (denying summary judgment, explaining that a jury could find that defendant "did not act with sufficient care and diligence to avoid further harassment..."); *Papp v. MRS BPO LLC*, 2015 WL 5247005, at *10 (D.N.J. Sept. 9, 2015) (denying summary judgment, and stating that "a jury could find the measures taken by the MRS Defendants including the MRS Defendants' failure to reach any conclusion as to whether the harassment occurred, their failure to create a report of the investigation other than several pages of sparse and unorganized handwritten notes, their failure to stop [alleged harasser] from interacting with Plaintiff, and their failure to provide little more than a verbal rundown of the sexual harassment policy to address the allegations of the harassment, was unreasonable) (internal citations omitted). The Third Circuit has said that requiring an employee to work in close proximity to an alleged former harasser does not create hostile work environment per se. *See Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 717 (3d Cir. 1997). However, in that opinion, the Third Circuit also stated that such behavior is "a significant factor weighing in [plaintiff's] favor." *Konstantopoulos*, 112 F.3d at 717. Similarly, the Court finds that this is a major factor supporting Plaintiff's case, and, combined with evidence that this was the fifth incident involving Infante, that Infante's interview testimony seemed to clash with that of other witnesses, and that Infante remained one of Plaintiff's supervisors, could support a jury determination that Defendants' remedial actions were insufficient.

Plaintiff also claims that she was "constructively discharged" when the hostile work environment caused her to mentally break down, go to the hospital, and not return to work

Defendants, as a preliminary matter, argue that the constructive discharge claim should not be considered for the first time in opposition to its motion for summary judgment, since there was no mention of "constructive discharge" in the pleadings. A constructive discharge claim requires a showing that the employer "knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." *Anastasia v. Cushman Wakefield,* 455 F. App'x 236, 241 (3d Cir. 2011). "Intolerability ... is assessed by the objective standard of whether a 'reasonable person' in the employee's position would have felt compelled to resign-that is, whether [she] would have had no choice but to resign." *Id.* (quoting *Connors v. Chrysler Fin. Corp.,* 160 F.3d 971, 976 (3d Cir.1998)). "To prove constructive discharge, the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment. *Spencer v. Wal-Mart Stores, Inc.*, 469 F.3d 311, 317 n.4 (3d Cir. 2006) (quoting *Landgraf v. USI Film Prods.*, 968 F.2d 427, 430 (5th Cir. 1992), *aff'd*, 511 U.S. 244 (1994)).

However, constructive discharge is not a "separate ground for relief" in this Circuit. *Knabe*, 114 F.3d 408, n. 1. Instead, it "would factor into damages" available to Plaintiff if she can prove sexual harassment liability. *Id.* In the event Defendant sought discovery with regard to damages, and Plaintiff has not disclosed proof of damages regarding constructive discharge, the Defendant may submit an in limine motion.

### III. Retaliation

The next question is whether Plaintiff has made out a prima facie case for retaliation. To make out a retaliation claim, plaintiff must establish that: "(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was

a causal connection between her participation in the protected activity and the adverse employment action." *Moore v. City of Philadelphia*, 461 F.3d 331, 340-41 (3d Cir. 2006).

For purposes of this motion, Defendants do not dispute that Plaintiff satisfied the first prong. Under the second prong, the employer's action must be "materially adverse to a reasonable employee." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006). "The anti-retaliation provision of [Title VII] protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Id.* at 67. The "reasonable worker" standard is objective. *Id.* at 68-69. The "materially adverse" standard is also meant to "separate significant from trivial harms." *Id.* at 68.

Defendants argue that Plaintiff only points to two minor disciplinary notices from August and September 2012, which were allegedly in retaliation for her February 2012 EED Complaint. They were considered minor. (DSMF ¶ 70). Also, the second suspension was never enforced because Plaintiff was on medical leave. (DSMF ¶¶ 77-78).

Defendants also claim that Plaintiff cannot show a causal connection between her EEO Complaint and the disciplinary notices that occurred six to seven months later. *See Clark County School Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001) (three to four month gap may be "insufficient" to infer causation); *see also Williams v. Philadelphia Housing Authority Police Dept.*, 380 F.3d 751, 760 (3d Cir. 2004) (two-month period negated causal connection). Moreover, two different lieutenants issued these notices, not Infante, which suggests there is no causation, according to Defendants, and the accusation that the two lieutenants were acting with Infante is pure speculation. "A factfinder could not reasonably impute…retaliatory intent to the entire police department." *Moore*, 461 F.3d at 351.

15

If a plaintiff establishes a prima facie case for retaliation, a defendant can provide a legitimate rationale for the action. Under the *McDonnell-Douglas* burden-shifting analysis:

> The burden shifts to the employer to advance a legitimate, non-retaliatory reason for its conduct and, if it does so, the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action.

*Moore*, 461 F. 3d 331 at 342 (internal quotations omitted). The employer's burden is "relatively light" and is met "by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Fuentes v. Perskie*, 32 F.3d. 759, 763 (3d Cir. 1994). "The employer need not prove that the tendered reason actually motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff. *Id.* Plaintiff must show that the employer's reasons contain "such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions" as to be "unworthy of credence." *Id.* at 765. "Proof of discriminatory motive is critical." *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335, n. 15 (1977).

Plaintiff contends that she had never been disciplined in her years working there. (PSMF ¶ 141). Plaintiff also says that the "voraciousness" of Lt. Morton's verbal abuse, which occurred while Infante just watched, suggests that this was pretextual. (Plaintiff's Brief in Opposition to Summary Judgment, at 28-29).

The Court finds that there is sufficient evidence to make out a prima facie claim for retaliation. Although Defendant notes that the discipline came six to seven months after her complaint, the discipline came one to two months after Infante returned from his suspension. Also, it is suspect that Pabon had not been disciplined in her entire career at the DOC. Therefore,

the timing of this discipline supports the claim that the discipline was pretextual. Summary judgment is denied on the retaliation claim.

## IV. Punitive Damages

Finally, Defendant argues that punitive damages are not justified in this case. Punitive damages are only permitted under Title VII if the plaintiff "demonstrates that the [defendant] engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. 1981a(b)(1). To recover punitive damages, "the plaintiff must prove that the defendant's conduct was wantonly reckless or malicious." *Domm v. Jersey Printing Co.*, 871 F. Supp. 732, 739 (D.N.J. 1994). Since the DOC transferred Infante during the course of its investigation, and required him to undertake some remedial courses prior to being reinstated at EMCF, the DOC's actions do not constitute wanton recklessness or malice. Accordingly, summary judgment is granted on punitive damages.

### ORDER

It is, on this ___9___ day of August, 2016, hereby

**ORDERED** that Defendants' Motion for Summary Judgment [ECF No. 22] is **GRANTED IN PART and DENIED IN PART** as follows:

Summary judgment is GRANTED as to Individual Defendant Infante, and all claims against him are dismissed;

Summary Judgment is DENIED as to all claims against the DOC; and

Summary judgment is GRANTED on punitive damages.

_____
PETER G. SHERIDAN, U.S.D.J.